# State Board of Education et al. v. Brown et al.

(Decided November 19, 1929.)

J. W. CAMMACK, Attorney General, and JAS. M. GILBERT, Assistant Attorney General, for appellant State Board of Education.

O. R. BRIGHT and B. C. GRANNIS for appellees Brown and others.

L. R. ROSS, J. M. McINTIRE and J. P. McCARTNEY for appellee Flemingsburg Graded School.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS— Affirming.

There is now established, and has been for a number of years, a graded school district for white pupils in Fleming county, Kentucky, including within its boundary the city of Flemingsburg and some adjacent territory, and which is known as Flemingsburg graded common school district, and it will hereafter be referred to as the "graded school district." The individual appellees, Arthur Brown and others, are colored people who reside and have children within the school age inside the limits of the graded school district. They brought this action in the Fleming circuit court against the graded school district and its trustees, the state board of education and

its members, and the county board of education and its members, for the purpose of obtaining a judicial determination as to whose duty it was to maintain a school for the education of the colored pupils residing within the limits of the graded school district. The petition set out the facts of the establishment of the graded school for white children only, and that heretofore the county board of education took the census of the colored pupils within the graded school district and reported same to the proper school authorities; that it collected the state pupil per capita for the maintenance of the free schools of the state, and maintained a colored school for the education of the colored pupils residing within the graded school district, but that at the beginning of the present school year the county board of education declined to continue to provide for and maintain a school for the education of the colored pupils within the graded school district, and that the latter also refused to do so, and that neither of them would take the census of the colored pupils in such territory, and plaintiffs prayed in their petition that it be adjudged which one of the two agencies—i. e., the trustees of the graded school, or the county board of education—should perform such duties, and that, when done, a mandatory injunction issue against the agency upon whom the court should adjudge that burden, requiring it and its trustees or members to perform the duties so adjudged.

The county board of education and the state board of education answered, and in substance denied that it was the duty of the county board of education to perform such duties, but that, on the contrary, it was the duty of the trustees of the graded school district to perform them, and prayed that it be so adjudged by the court. The trustees of the latter answered, and took the opposite position. Upon final submission upon the various demurrers and motions made by the respective parties to the litigation, the court determined that it was the duty of the county board of education to maintain a school for the colored pupils residing within the graded school district, and issued a mandatory injunction to its members to take all steps necessary for that purpose, and from that judgment this appeal is prosecuted.

It is most strenuously argued in briefs for the county and state boards of education that a proper interpreta-

tion of the various statutes affecting the question clearly requires that the school for the education of the colored pupils residing within the graded school district should be maintained by the trustees of that district, and that our opinion in the recent case of Raley v. County Board of Education of Woodford County, 224 Ky. 50, 5 S. W. (2d) 484, in so far as it construes the statute then in force to the contrary, is unsound and should be overruled. An urged reason, and we might say the principal one for that argument, is the alleged extreme unfairness and inequitable results that would be entailed upon the taxpayers of the county residing outside of the graded school district, if the principles announced in the Raley opinion should be adhered to.

It is also urged upon us that chapter 56, page 208, of the Session Acts of 1928, in its fifth section, prescribes for the maintenance of a colored school for the colored pupils residing in the graded school district to be maintained by the trustees of the latter district, and which, if true, supersedes our opinion in the Raley case, and renders the principles therein announced no longer applicable.

Counsel, in making such arguments, seem to have overlooked the most important fact, that neither in the Raley opinion nor the pleadings in this case was or is the question raised or presented as to the liability of the assessed property for ad valorem taxes owned by white people within the graded school district for its proportionate part of the county levy for school purposes, to the extent of the number of colored pupils residing in the graded school district bear to the entire number of pupils therein. The only question presented in the Raley case, and the only one presented in this one, was and is: Whose duty was it to maintain, provide for, and manage the school for the colored people residing within the geographical limits of the graded school district? Consequently the question as to the source or sources from whence the funds might be collected to defray the expenses of such maintenance was, we repeat, neither presented nor involved in the Raley case, and neither is it done in this one.

In making that statement, in so far as it relates to the presentation of the question in this case, we have not overlooked the fact that in the prayer of the answer of

the county board of education for Fleming county the court is asked to determine "what proportion defendants may have of the tax levy made by the board of trustees of the Flemingsburg graded common school district for the proper maintenance of the colored school in said district." That prayer, it will be observed, is altogether different and apart from the question argued by counsel, since the inserted portion of the prayer asked for a proportionate division of the taxes levied and collected by the white graded school district that defendants would be entitled to as a part of the funds with which to maintain a school for colored pupils residing within the district, when the argued and pertinent question is whether the property owned by white people in the district may be assessed by the fiscal court of the county, for the board of education of the county for its proportionate part of such county levy to be used for the education of the colored children residing within the graded school district. The inserted portion of the prayer of the answer simply asked for a proportionate division of the funds collected by the trustees of the graded school district from *white property alone,* and which was collected *solely* to maintain the white graded school, instead of asking for an adjudication of the question as to whether such property may be required to bear its proportionate part of the levy for public schools and which two questions are widely separated and easily distinguishable.

We pointed out in the Raley opinion that the graded school district there involved, which is identical in character wth the one here involved, was established exclusively by the *white* taxpayers residing within the limits of such district, and that the colored pupils residing within the same limits occupied the same status as pupils within the *county* as a school unit that they did prior to the establishment of the white graded school. The earnestness of counsel in briefing this case has not convinced us that our interpretation of the applicable statutes at that time was or is erroneous. On the contrary, we are now as firmly convinced as we were then that the establishment of a graded school district for *white pupils alone* had no effect whatever on the status of colored pupils living within the same territory. The law under which the graded school district was established recognized in the most explicit terms that each race might establish for

itself a graded school district covering a prescribed territory, and that such establishment did not impose a burden on the property within the district owned by the nonestablishing race to maintain or contribute to the school established by the other race, and from which it logically results that pupils of such nonestablishing race occupied the same position as they did before the establishment of the graded school within that territory by the other race. Not only is that conclusion supported by the reasons set out in the Raley opinion, but by the additional one that to hold otherwise would result in the imposition of a burden upon the property owned by the race establishing such graded school that neither the participating members of that race, nor the statute under which it was established, ever contemplated. But as to whether the property of such establishing race would be liable for its proportionate part of the county levy for school purposes as the colored children within the district bore to the entire number of school pupils within the district was and is a question which, we repeat, was not involved in the Raley opinion, nor is it involved in this case.

But, as above stated, it is insisted that section 5 of the 1928 act, supra, provided differently, and that it is now the duty of the trustees of the graded school under that section to maintain the school for colored pupils within the geographical limits of that district. In the first place, we do not construe the language of that section to so prescribe as do counsel who rely on it; but, if its language clearly prescribed for the maintenance of the colored school for pupils residing in the graded school district by the trustees of such district, then it is clearly unconstitutional, because its subject-matter is not included in, nor is it germane to, the title to the act, and is, therefore, in conflict with section 51 of our Constitution. The title of the 1928 act reads: "An act prescribing procedure whereby adjacent school districts in any county may be combined; also designating procedure and means whereby county, city and graded common school district boards of education may transfer students of any grade from one school district to a public school in another district without changing district boundaries." It will be perceived that the only contemplated legislation incorporated in the title relates (1) to the *procedure*

whereby adjacent school districts may be combined, and (2) designating the *procedure and means* whereby any school district, including graded common school districts, may transfer students from its school district to a public school in another district without changing the boundaries of the transferring district. Anything else contained in the act not relating to such *procedures* is clearly unauthorized by the inserted title, and which conclusion is so manifestly correct under the numerous opinions of this court construing section 51 of the Constitution that we deem it unnecessary to insert the cases in support thereof. The inserted title is definite and specific, and no one reading it would conclude that any following legislation under it looking to a change or alteration of the duties of trustees of *white* graded school districts, so as to impose the duty on them to provide for and maintain a school for colored pupils within that district, who were legally a part of the pupils within the common school district composed of the county, was ever contemplated, and for which reason the very purpose of the adoptoin of section 51 of the Constitution would thereby be thwarted.

Since, therefore, we still adhere to the principles announced in the Raley opinion, and also since the 1928 act does not, for the reasons stated, dispense with them, our conclusion is that the judgment was proper, and it is affirmed.

Whole court sitting.